NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

———————————————

MUSD DBA MARICOPA COUNTY REGIONAL SCHOOL DISTRICT NO
509, *Petitioner Employer*,

THE ARIZONA SCHOOL ALLIANCE FOR WORKERS
COMPENSATION POOL, *Petitioner Insurance Carrier*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent,*

SPECIAL FUND DIVISION, *Respondent Party in Interest*,

LOURDES ESTRADA, *Respondent Employee*.

No. 1 CA-IC 22-0002
FILED 8-30-2022

———————————————

Special Action - Industrial Commission
ICA Claim No. 20180610478
Carrier Claim No. 2017003014A
The Honorable Marceline Lavelle, Administrative Law Judge

**AWARD SET ASIDE**

———————————————

COUNSEL

Wright Welker & Pauole PLC, Phoenix
By Linnette Flanigan, Shannon Lindner
*Counsel for Petitioner Employer and Carrier*

Industrial Commission of Arizona, Phoenix
By Gaetano J. Testini
*Counsel for Respondent*

Law Office of Eric C. Awerkamp, Mesa
By Eric C. Awerkamp
*Counsel for Respondent Employee*

---

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding Judge Brian Y. Furuya and Judge Jennifer B. Campbell joined.

---

**M C M U R D I E**, Judge:

**¶1**         The Industrial Commission of Arizona calculated a loss of earning capacity for Lourdes Estrada based on a finding that her college degrees were from an unaccredited university. Because the record evidence does not support that finding, we set aside the award.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**         Estrada is 63 years old and has spent most of her working life in schools as a teacher, teacher's aide, classroom assistant, guidance counselor, program director for the YMCA, and field supervisor for an after-school program. In 2018, while working as an elementary school teacher for the Maricopa Unified School District ("MUSD"), Estrada fell and injured her left shoulder, causing a seven percent permanent impairment.

**¶3**         The Industrial Commission of Arizona ("ICA") determined that Estrada suffered no loss of earning capacity because of the impairment. Estrada requested a hearing to contest that finding. Estrada and two labor market experts testified at the hearing. During the expert testimony, an issue arose about whether the online university from which Estrada obtained her bachelor's and master's degrees between 2010 and 2014 was accredited. This issue became a lynchpin for the award.

**¶4**         In preparation for the hearing, the labor market experts authored reports setting forth the basis for their opinions about whether and how much Estrada suffered a loss of earning capacity. Rebecca Lollich,

the expert hired by the insurance carrier,[1] filed her report in July 2020 and updated it in March 2021. In her report, she noted that Estrada obtained an early childhood education certificate from Irvine College in 1996, a bachelor's degree in organizational management in 2010 from Ashford University (online), an MBA with an emphasis in entrepreneurship from Ashford (online) in 2012, and a master's degree in education from Ashford (online) in 2014. Finally, Lollich noted that Estrada had received a temporary emergency teaching certificate in 2017, which allowed her to teach kindergarten for MUSD. The report stated that because Estrada had a master's degree in education, she could get a permanent certification if she filed the proper paperwork.

¶5            Lollich's report stated that Estrada could not teach in public schools because she does not have a teaching certificate in Arizona. But certification is not required for teaching in charter schools, even though charter schools prefer teachers with certification. Thus, Lollich focused on the suitability and availability of teaching positions in charter schools. She concluded that Estrada was qualified to teach kindergarten or early education in a charter school and that such jobs were available. This led to a slight loss of earning capacity and a monthly entitlement of $52.34.

¶6            Estrada's labor market expert, Gretchen Bakkenson, also noted that Estrada had been working for MUSD under an emergency teacher certification because she did not have a permanent Arizona teaching certificate. Bakkenson determined that because Estrada's work experience was with kindergarten and first grade, Estrada would not qualify to teach older children. Bakkenson's report noted that Estrada had master's degrees in business and education. Her report concluded that Estrada could find a job as a substitute teacher at a charter school or as a first-grade teacher at a charter school, which caused a loss of earning capacity and monthly entitlements of $1541.70 or $445.10, respectively.

¶7            Neither expert mentioned Ashford University's accreditation status in their reports.

¶8            At the hearing, Estrada testified first. During Estrada's testimony, the following exchange about her graduate degrees occurred:

---

[1]        We call Petitioners "the carrier" throughout this decision.

Q. And after you obtained those online degrees from Ashford University, did you learn as to whether or not their program was credentialed?

A. They said—they claimed they were credentialed.

Q. Okay. And then did you subsequently learn whether they were?

A. Now I'm finding out more. Actually, Ashfor[d] University has lawsuits pending because they—they tell you you can get the degree and these other jobs you're able to obtain with those degrees, and that is false. In my case, that happened to me, that it didn't—didn't follow through with everything in education.

Q. So despite a master's degree in education from Ashford, were you ever able to qualify to teach school in Arizona?

A. No.

Estrada testified she had obtained emergency certification to teach in Arizona, which she used to work at MUSD. This emergency certification was temporary, and Estrada had not received a permanent teaching certificate in Arizona. She gave no other information about Ashford's accreditation status, which was not discussed further during her testimony.

¶9 Bakkenson was the next witness. Early in her testimony, she stated that Estrada did not have a bachelor's or master's degree from an accredited institution. Bakkenson testified that Estrada had told her this after she issued her written report. This was the first time the accreditation information was raised in the record. Because of this new information, Bakkenson ruled out any teaching job other than substitute teaching for charter schools and modified her opinion to exclude the $445.10 monthly entitlement, leaving only the entitlement of $1541.70. During her direct testimony, she stated several times that Estrada's degrees were not from an accredited institution. On cross-examination, she admitted that the sole basis for her belief that Ashford was not accredited when Estrada received her degrees was Estrada's post-report statement.

¶10 Lollich testified that when she interviewed Estrada, Estrada did not mention that her degrees were from an unaccredited school. Before she testified, Lollich tried to determine whether Ashford was accredited

when Estrada obtained her degrees, but she could not. Even so, Lollich testified that she looked at the requirements for an Arizona emergency teaching certificate and found that it required a bachelor's degree or an advanced degree from an accredited university along with an official transcript. Thus, she assumed that Ashford was accredited when Estrada obtained her degrees. During the cross-examination, the following occurred between Estrada's counsel, Eric Awerkamp, the carrier's counsel, Linnette Flanigan, and the administrative law judge ("ALJ"):

> Q. . . . . Would you agree that she does not have accreditation for her bachelor's, her one master's was completely completed before any accreditation, and most of her coursework on the other one was completed before any accreditation?
>
> MS. FLANIGAN: Your Honor, I'm going to object. This assumes facts not in evidence. There is no evidence that that school was not accredited other than Ms. Estrada's self-serving testimony.
>
> MR. AWERKAMP: There is—there is no evidence in this case that it was an accredited facility. And you can look up on the database in two minutes—they're trying to make the Court believe that somehow people wouldn't know this. You can look it up in two minutes and tell what universities are accredited and which ones are not.
>
> JUDGE LAVELLE: But the question here is more specific, and that is where is the evidence that indicates, with respect to the one master's degree, if the institution—and I don't care whether it's the one the applicant was attending or any other—if they were unaccredited, received accreditation during the course of study for any individual, and when that individual finishes their program, they're finishing it with an accredited institution? . . . How can we find as a fact—or how could I find as a fact that that was a degree issued—let's make it an accredited degree as opposed to dealing with the institution, without evidence? I mean, I understand both of your points. That's not, you know, what I'm discussing. It's that if you want me to find as a fact whether her degrees were issued from an accredited or an unaccredited school, then there would have to be some information as to when this school received accreditation and how accreditation being

concurred [sic] in the midst of a program affects the ultimate outcome when the certificate/diploma, or whatever you want to call it, is awarded at the end of that program. I mean, we can muse about it all day but . . . I'm just saying there's nothing in evidence to support either or all of those assertions. That's all I'm saying.

MR. AWERKAMP: Let me ask it a different way. . . . Ms. Lollich, have you seen any documentation, any evidence of any form in this case indicating that Ms. Estrada has an accredited degree?

A.      Nothing directly, but she was able to obtain her emergency teaching certificate, which requires that, so my assumption would be, yes, that she has it.

\*          \*          \*

Q.      Okay. Was she able to provide a bachelor's from an accredited facility/institution to get that?

A.      My assumption would be yes or she wouldn't have been provided with the emergency certificate.

\*          \*          \*

Q.      You didn't ask her about the accreditation, though, correct?

A.      No, it did not come up. She didn't give me any indication that it wasn't accredited—or didn't attended [sic] anything that was not accredited.

Lollich's testimony concluded without further mention of the accreditation issue.

¶11      The ALJ issued an award that found substitute teaching "the most likely and/or probable employment" for Estrada. Thus, she declared a loss of earning capacity and awarded Estrada a monthly entitlement of $1541.70. The award summarized the testimony of the witnesses. Although it made no explicit finding about the accreditation status of Ashford University when Estrada obtained her degrees, the conclusion is based on Estrada's degrees being from an unaccredited institution.

¶12      The carrier requested administrative review, arguing that Bakkenson's opinion was unreliable because it was based on an erroneous conclusion that Ashford was not an accredited institution when Estrada obtained her degrees. In support of that argument, the carrier attached two exhibits to its request for review: (1) a checklist from the Arizona Department of Education showing the requirements for an emergency teaching certificate; and (2) a printout of a web page from the Higher Learning Commission ("HLC") showing that HLC accredited Ashford University from 2005 to December 2013. Furthermore, in a footnote in its memorandum, the carrier stated that since 2013, Ashford has been accredited by the Western Association of Schools and Colleges Senior College and University Commission ("WSCUC") and provided a URL link to the WSCUC website page relevant to Ashford. That website stated that Ashford was first accredited in 2013 and provided links to WSCUC documents chronicling the history of Ashford's accreditation status.[2]

¶13      Thus, the carrier provided evidence that a degree from an accredited institution was needed to obtain an emergency teaching certificate, and Ashford had been accredited since 2005. The carrier concluded that "any award based upon the assumption that [Estrada] lacked a degree from an accredited institution that somehow negatively impacted her earning capacity must be reviewed and reconsidered." Estrada filed a response that provided no contradictory evidence, stating that the only relevant factor was that she did not have a current Arizona teaching certificate.

¶14      On review, the ALJ "fully reconsidered" the case, accepting and considering the exhibits attached to the review request, and issued a decision. The ALJ began with the following finding:

>      It is undisputed that [Estrada] reported to the labor
> market consultants and testified that the undergraduate and
> post-graduate degrees she obtained from Ashford University
> were not valid as Ashford was not an accredited institution
> when she began each of those degrees.

The ALJ then discussed information she gleaned from the link to the WSCUC website, including information that the link "leads to." She found that whether Ashford was accredited when Estrada attended was

---

[2]      *See* https://www.wscuc.org/institutions/the-university-of-arizona-global-campus/.

"completely unclear." She also found that "the evidence as to when Ashford was accredited is unreliable," declaring that Ashford was accredited in 2020 when the University of Arizona Global Campus acquired it. The ALJ also concluded that Estrada's degrees were "not from an accredited institution." The ALJ did not mention the document from HLC and affirmed the award. This statutory special action followed.

## DISCUSSION

¶15 We consider the evidence in the light most favorable to upholding the ALJ's award. *Lovitch v. Indus. Comm'n*, 202 Ariz. 102, 105, ¶ 16 (App. 2002). We defer to the factual findings of the ALJ but review questions of law *de novo. Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14 (App. 2003). We will not disturb findings unless they are unsupported by sufficient competent evidence. *Pac. Fruit Express v. Indus. Comm'n*, 153 Ariz. 210, 214 (1987). But where no evidence supports the findings or conclusions of an award or where they are clearly erroneous, they will not be permitted to stand. *Blasdell v. Indus. Comm'n*, 65 Ariz. 373, 379 (1947).

¶16 The goal of establishing earning capacity "is to determine as near as possible whether in a competitive labor market the [worker] in his injured condition can probably sell his services and for how much." *Davis v. Indus. Comm'n*, 82 Ariz. 173, 175 (1957). Residual earning capacity can only be established by evidence of suitable and reasonably available jobs. *Zimmerman v. Indus. Comm'n*, 137 Ariz. 578, 582 (1983). In determining suitability and availability of employment, the worker's level of education, among other factors, must be considered. *Cramer v. Indus. Comm'n*, 19 Ariz. App. 379, 381 (1973) ("[A] workman with only a high school education does not have available to him jobs . . . [that] require a college degree."). Thus, one's level of formal education is a critical factor in determining earning capacity.

¶17 In Estrada's case, a critical finding by the ALJ is unsupported by competent evidence, specifically, that Ashford was not accredited when Estrada attended and obtained her degrees. The only evidence of the lack of accreditation came from Estrada. We do not find her testimony on this subject unequivocal. But viewing it in the light most favorable to upholding

8

the award, as we must, we acknowledge that it may tend to show a lack of accreditation.[3]

¶18         The only evidence that Ashford was not accredited is Estrada's hearsay statement to Bakkenson, apparently made after Bakkenson issued her written report. Estrada never told Lollich that her degrees were from an unaccredited institution. Nor is the lack of accreditation evident on her resume. Thus, the anemic testimony at the hearing and the hearsay statement made in unusual circumstances are the only support in the record for a finding that Ashford was not accredited when Estrada obtained her degrees. And Estrada's statements are not the best evidence to determine an accreditation issue.

¶19         On the other hand, the record also contains clear and unchallenged evidence directly from accrediting institutions that support Ashford's accreditation during the time Estrada attended. First, the carrier rightly pointed out that the issuance of an emergency teaching certificate to Estrada supported an inference that Ashford was accredited when Estrada obtained her degrees because accreditation of the degree-granting school is a requirement for state certification. The carrier also submitted documentation that revealed accreditation during the relevant period, roughly 2010 through 2014.

¶20         In the decision, the ALJ failed to mention the documentation from HLC, which evidenced accreditation from 2005 through 2013. Yet this documentation was relevant to whether Ashford was accredited in 2010 and earlier when Estrada attended and obtained her bachelor's degree. Some experts discussed employment positions requiring only a bachelor's degree from an accredited institution. Some positions require a degree in education or a field related to the subject matter taught, but not all. As a result, whether Ashford was accredited when Estrada obtained her bachelor's degree was a critical issue that needed to be addressed to determine which potential positions were available to her. Yet the ALJ ignored the HLC evidence. Instead, the ALJ focused on the website to the WSCUC accreditation of Ashford that began in 2013.

¶21         The ALJ acknowledged that the website "noted accreditation as of 2013." The ALJ then emphasized that the accreditation in 2013 was issued with a "*Notice of Concern*." Yet, we find nothing on the linked website

---

[3]      There is no explicit finding about Estrada's credibility in general or for the specific statement.

that supports that finding. The website states that the school's "*Current Accreditation Status*" is "Accredited with Notice of Concern," but that means the school "*currently* meets WSCUC Standards, [but] is in danger of being found out of compliance." (Emphasis added.) The website also showed that WSCUC first accredited the school in 2013. A link on the web page[4] leads to a copy of a letter issued July 10, 2013, in which the accrediting commission found Ashford in "substantial compliance" and granted accreditation for five years.[5] Yet the ALJ found that the website evidence was "completely unclear," expressing doubt about Ashford's status in 2013 based on the acquisition of the school by the University of Arizona in 2020. The ALJ also found that "the evidence as to when Ashford was accredited is unreliable: the [carrier] asserted that certification was granted in 2013 but the link provided by the [carrier] leads to information indicating Ashford was acquired in 2020; thus, it would have received certification in 2020."

**¶22**     The ALJ ultimately found that "[b]ased upon a review of the record and the parties' position statements, Ashford University was not an accredited institution until 2020 when it was acquired by an accredited institution, University of Arizona Global Campus." But the 2020 acquisition is irrelevant to the inquiry, and the accreditation finding is not supported by the information on the website, which the ALJ reviewed as part of her reconsideration. Again, the letter on the website states that Ashford University was first accredited in 2013.

**¶23**     Factual errors relied on by the ICA can lead to a decision not reasonably supported by the evidence. *See Gore v. Indus. Comm'n*, 15 Ariz. App. 347, 350 (1971) (award set aside when conclusion by the hearing officer contained "many errors"). Furthermore, expert testimony can be so weakened by proof of an inaccurate factual background that the expert testimony does not constitute substantial evidence. *Desert Insulations, Inc. v. Indus. Comm'n*, 134 Ariz. 148, 151 (App. 1982). Our supreme court has said: "The value of an expert's opinion is dependent upon and is no stronger than the premises upon which it is predicated, and such an expert opinion has no probative force if any one of these premises is shown to be false." *Stanley v. Indus. Comm'n*, 75 Ariz. 31, 33 (1952). Here, the ALJ relied on Bakkenson's opinion, which incorrectly assumed that Estrada's degrees were from an

---

4     *See* https://wascsenior.app.box.com/s/9c8lbd7zaahu96nuna1p.

5     Ralph A. Wolff, Western Association of Schools & Colleges, Accrediting Commission for Senior Colleges & Universities, *Commission Action Letter — Ashford University* 6 (2013).

unaccredited institution. Thus, the award is not supported by substantial evidence and must be set aside.

¶24        Although not raised by the parties, we would also set aside the award on another basis. In *Zimmerman*, our supreme court held that findings in loss-of-earning-capacity cases should describe job opportunities that are both suitable and reasonably available. 137 Ariz. at 582. In *Landon v. Industrial Comm'n*, 240 Ariz. 21 (App. 2016), this court reversed an ALJ who made no findings on whether the injured worker met his burden of showing why he could not return to his date-of-injury employment or whether he made a good-faith effort to obtain other suitable employment. Nor were findings made in that case showing that the ALJ considered the various factors outlined in A.R.S. § 23-1044(D) and (G) that are required to determine loss of earning capacity. *Landon*, 240 Ariz. at 28–29. We concluded that "[w]ithout findings specifically addressing loss of earning capacity, and the factors related to it, we are unable to determine whether the ALJ erred." *Id.* at 29. Accordingly, we set aside the award for failing to make the statutory findings. *See Aguirre v. Indus. Comm'n*, 247 Ariz. 75, 77, ¶ 12 (2019) (A judicial officer must make findings of fact and conclusions of law, and each finding must contain facts supporting it.).

**CONCLUSION**

¶25        Because the ALJ relied on an expert opinion based on an erroneous understanding of a critical fact, we set aside the award.

